**John HUSS, Personal Representative of the Estate of Norma J. Davey, Deceased and John Huss, Personal Representative of the Estate of Clarence Davey, Deceased, Plaintiff,**

v.

**UNITED STATES of America, and the State of Michigan, Jointly and Severally, Defendants.**

**No. K86–81 CA4.**

United States District Court, W.D. Michigan, S.D.

April 24, 1990.

Jeffrey S. Cohen, Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick, Detroit, Mich., for plaintiff.

Richard C. Bensinger, Bensinger, Combs & Cotant, Gaylord, Mich., and Anne Vandermale Tuuk, Grand Rapids, Mich., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Senior District Judge.

This action is brought by the plaintiff, John Huss, as the independent personal representative of the estates of Clarence and Norma Davey, against the defendants, the United States of America and the State of Michigan. Clarence and Norma Davey, husband and wife, were killed on the evening of August 6, 1983 when their car collided with a Michigan National Guard truck near Camp Grayling in Crawford County, Michigan.

This case was tried before the Court sitting without a jury over a period of four days. Before trial, the parties submitted proposed findings of fact and conclusions of law. Upon the conclusion of the trial, and with the permission of the Court, the parties submitted additional proposed findings and conclusions of law. Accordingly, the case is now ready for decision.

## FINDINGS OF FACT

Based upon the testimony and exhibits received at trial, the Court makes the following findings of fact as required by Fed. R.Civ.P. 52(a) [1]:

1. The plaintiff John Huss is the independent personal representative of the estates of the deceased, Clarence and Norma Davey, husband and wife.

2. At the time of his death on August 6, 1983, Clarence Davey was 55 years old. At the time of her death on August 6, 1983, Norma Davey was 52 years old. The Daveys resided in Grayling, Michigan.

3. The Daveys are survived by three adult children: Michael Davey, age 39, who resides in Howell, Michigan; John Davey, age 38, who resides in Detroit, Michigan; and Bonnie Welemirov, age 36, who resides in Grayling, Michigan. [2]

4. During the morning and afternoon of August 6, 1983, Clarence and Norma Davey consumed considerable quantities of beer.

5. On the evening of the same date, the Daveys traveled to a party located at a cabin at Camp Arrowhead near Grayling, Michigan. At this party, they continued their beer drinking to an extent that Norma Davey appeared visibly intoxicated.

6. At the time of the accident, Clarence Davey was driving the couple's orange 1972 Volkswagen "beetle" automobile. Norma Davey was the passenger.

7. After leaving the party, and driving approximately ten miles toward their home, as they were traveling in the southbound lane of Military Road, the Davey vehicle collided with a two and one-half ton military truck which was obstructing the road at the intersection with Beaver Creek Road near Grayling, Michigan. Both Clarence and Norma Davey were killed instantly as a result of injuries they sustained upon the impact. The accident occurred shortly after 10:00 p.m. on August 6, 1983.

8. The location in which the collision occurred is a straight, relatively level stretch of road, surrounded by a heavily wooded area. Military Road is a two-lane paved road. Beaver Creek Road is unpaved. The accident occurred shortly after nightfall.

9. The military truck (which will hereinafter be referred to as the "deuce") which

---

1. Any findings of fact which contain conclusions of law should be considered as such.

2. The Daveys are also survived by four grandchildren: Katy Davey, age 9 (daughter of John); Jessie Davey, age 19 (son of Michael); Jennifer Davey, age 9 (daughter of Michael); and Candy Howard, age 19 (daughter of Bonnie). The plaintiff is seeking compensation on behalf of the Davey grandchildren as well as the three adult children.

the Davey vehicle struck was one of three Michigan National Guard vehicles, containing a total of six active duty members of the Michigan National Guard, who were traveling as a convoy from Kalamazoo, Michigan en route to summer maneuvers at Camp Grayling, a National Guard post in Grayling, Michigan.

The guard vehicles were part of a maintenance "trail party" assigned to follow behind a main convoy of Guard vehicles which had left Kalamazoo earlier for Grayling. The three vehicles on the scene at the time of the accident included the two and one-half ton vehicle, or "deuce," which was struck (which was part of the "C" company), a second deuce (which was part of the "A" company), and a five-ton wrecker (which was also part of the "A" company). In addition, each of the deuces was towing a jeep. Both deuces were painted with camouflage paint.

10. Guardsman Woodrow Caswell was driving the "C" deuce at the time of the collision. The three guard vehicles had turned onto northbound Military Road from the exit of M–27. A short distance south of Beaver Creek Road, all three vehicles pulled over to the right side of Military Road, with the wrecker in the lead, in which two guardsmen, Sargeant Gary Johnson and Robert Grimms, were traveling. Johnson walked back to inform the guardsmen in the two other vehicles that they had passed their exit into Camp Grayling. After some discussion among the guardsmen, it was decided that they would proceed to Beaver Creek Road and turn around at the intersection with Military Road.

11. The three vehicles, with the wrecker in the lead, pulled up to a point immediately south of Beaver Creek Road on the northbound side of Military Road. The wrecker was the first vehicle to turn.

With Grimms driving, the wrecker swung left across Military Road, pulled forward onto the southbound side shoulder of Military Road, south of the Beaver Creek intersection, and stopped.

12. Johnson served as a "ground guide" [3] while Grimms turned the wrecker. Johnson, positioning himself on the driver's side at the rear of the "C" deuce, continued to serve as ground guide while Caswell proceeded to make his left turn. Due to the length of the deuce, which included the jeep which was in tow behind, Caswell was required to make a three-point turn; he intended to turn left onto Beaver Creek Road, back up across Military Road, and then pull onto the southbound shoulder of Military Road behind the wrecker.

Caswell pulled the deuce far enough onto Beaver Creek Road for the jeep, which was in tow behind the truck, to straighten behind him. In this position, his view north and south down Military Road was obstructed by the trees lining the road area. Thus, he did not look right and left for traffic on Military Road; instead, he looked in his rear view mirror on the driver's side of the deuce to ensure that the jeep did not jackknife. He relied solely on his ground guide Johnson to watch for traffic. As Caswell began to back the deuce, the jeep began to jackknife. He again pulled the deuce forward onto Beaver Creek Road, and again began to back slowly across Military Road, relying solely on Johnson to watch for traffic on Military Road. [4] The jeep once again began to jackknife, its rear wheels caught in a ditch on the northbound side of Military Road. [5] Johnson walked back to the jeep to straighten its wheels and steer it through the ditch. As he continued to maneuver the jeep steering wheel, he observed the headlights of the Davey Volkswagen approaching the pas-

---

3. Military procedure required use of a "ground guide" during the backing of large vehicles. Ground guides serve a safety function; they are used to watch for traffic and to ensure that the vehicle does not collide with objects or other vehicles while backing.

4. Caswell may have made three attempts at backing the jeep; it was sometime during this

second or third attempt that the Davey Volkswagen struck the passenger side of the "C" deuce.

5. The intersection of Beaver Creek and Military Roads is not a four-way intersection; Beaver Creek Road ends at the southbound side of Military Road.

senger side of the "C" deuce on the southbound side of Military Road. At the time Johnson first saw the Volkswagen, it was already ten feet or less away from impact. Caswell did not see the Davey car approaching, nor did any of the other guardsmen warn him of its presence.[6] He was completely unaware of the Volkswagen until he felt its impact. Upon the impact, Caswell was thrown against the driver's side door of the deuce. He was not injured. He did not move his vehicle after he felt the impact. The Volkswagen struck the "C" deuce on the passenger side at its gas tank.

13. Immediately after the collision, Caswell walked over to the Davey car. Caswell walked very close to the car and smelled an odor of alcohol. He observed the Daveys, who appeared unconscious.

14. Shortly after the collision an unidentified female driver traveling southbound on Military Road stopped at the scene, claiming to be a registered nurse. She checked the Daveys to determine whether either of them had a pulse, finding no pulse on either of them.

15. Johnson and Grimms unhooked the jeep which had been in tow behind the "C" deuce. Grimms drove the jeep to the National Guard post to call for help. After unhooking the jeep, Johnson approached the driver's side of the Volkswagen. He smelled a very strong odor of alcohol as he stood next to the Davey's car. The police arrived on the scene approximately ten minutes after the accident.

16. At the time of the collision, the second deuce—the "A" deuce—was parked on the northbound side shoulder of Military Road, immediately south of the "C" deuce and Beaver Creek Road. (This vehicle was preparing to turn around after the "C" deuce completed its turn.) The headlights and emergency flashers of this vehicle were on at the time of the collision, and were facing the direction from which the Davey car approached. Further illumination at the scene was provided by a large yellow flashing beacon located atop the cab of the wrecker (which stood on the southbound side shoulder of Military Road on the opposite side from the Daveys' approach), which in height was substantially taller than the cabs of the deuces.[7] In addition, the head and taillights of the "C" deuce were on.

17. The reflectors located on the "C" deuce were covered at the time of the accident, either by a tarp covering the truck, by camouflage paint, or by camouflage tape. In any event, these reflectors were not visible to the Davey vehicle. However, yellow and red reflectors located on the side of the jeep facing the Daveys were not covered and were visible to approaching traffic.

18. In preparing to execute their turns, none of the guardsmen placed flares, reflective triangles, flashlights, or used any devices other than their vehicle lights, the wrecker beacon, and the "A" deuce emergency flashers to warn oncoming motorists of the potential obstruction of Military Road. Warning equipment was available on the two deuces and could have been used if necessary. Johnson was the only guardsman to serve as a ground guide during the turning maneuver. He stood on the driver's side of the "C" deuce. None of the guardsmen stood on the opposite side of the deuce in the direction from which the Davey car approached. When Johnson was temporarily distracted with the jackknifing jeep, none of the other guardsmen were watching for or positioned to alert approaching traffic.

6. The testimony established that six guardsmen were present at the time of the accident: Johnson, Grimms, Caswell, Dennis Ouding, Christopher Douglas and Meredith (whose first name is unknown to the Court). Ouding, who had earlier been driving the "C" deuce, was not in the truck at the time of the collision. He allowed Caswell to turn the vehicle because Caswell was a more experienced driver. Ouding was standing on the shoulder at the south corner of Beaver Creek Road while Caswell was attempting to execute the turn. Ouding did not serve as a ground guide and was not watching for oncoming traffic. Johnson was the only guardsman to serve as a ground guide. Presumably, the remaining guardsmen remained in their trucks.

7. The head and taillights of this vehicle were also on at the time of the collision.

19. There is no evidence that Clarence Davey was aware of or reacted to the presence of the "C" deuce before the impact; there is no evidence of swerving, braking, or skid marks. After the collision, the speedometer of the Volkswagen remained stuck at approximately 50 miles per hour. Clarence Davey was driving in his own lane of travel at the time of the impact; the "C" deuce was completely blocking both lanes of traffic on Military Road.

20. The illumination at the accident scene was, in spite of the absence of flares, triangles, or flashlights, sufficient to alert oncoming motorists, at an assured clear distance, to the presence of the "C" deuce obstructing the road. While the deuce was pulled into Beaver Creek Road, Caswell observed a pick-up truck (traveling southbound on Military Road) slow down and go around the rear of the jeep which he was towing.[8] Kirk Wakefield, an officer with the Crawford County Sheriff's Department was the first police officer to arrive on the scene after the accident. As he approached the scene from southbound Military Road—the same approach as that taken by the Daveys—he did not see the yellow beacon which was flashing atop the wrecker, parked on the opposite side of the "C" deuce, although he did see the lights of the "A" deuce parked on the left side of Military Road. He was able to see the "C" deuce from a few hundred feet away with his high beam headlights.

21. The deputy medical examiner for Crawford County, Dr. Charles Gosling, pronounced the Daveys dead at the scene of the accident.[9] Neither of the Daveys experienced any conscious pain or suffering.

22. After the accident, the bodies of Clarence and Norma Davey were taken by ambulance to the morgue, located at Grayling Mercy Hospital. Approximately four hours after their deaths, at the request of a police officer (probably William Heemer, who was called in to assist in an accident investigation)[10], Dr. Gosling withdrew blood samples from both bodies. These samples were forwarded to the Michigan Department of State Police for blood alcohol content analysis. Dr. Herbert Wetherell, the defendants' expert and a toxicologist employed by the Department of State Police, tested the samples. He determined that ethyl alcohol was present in both bodies.

23. Dr. Wetherell determined that Norma Davey had a blood alcohol level of .36 percent, and based upon this level observed that she was "drunk, very drunk."[11] Dr. Wetherell also determined that Clarence Davey had a blood alcohol level of .27 percent, a level which he testified was "kind of tough to get to. You've got to work at getting an alcohol that high."

24. Alcohol depresses brain function and affects one's ability to think clearly and coordinate movement. The "higher centers"—thinking functions—are affected first; this includes cognition and reasoning, judgment, and processing information from multiple sources simultaneously. Eventually, the alcohol affects motor control, including vision, the ability to stand, and hand-eye coordination. Judgment, reaction

---

8. After the accident, two other pick-up trucks traveling southbound on Military Road came upon the accident scene. The first truck stopped and the driver got out of his vehicle. He appeared to have no trouble stopping his vehicle in time to avoid a collision; he pulled over to the side of the road approximately three car lengths north of the Beaver Creek intersection. A second truck which had been following the first slowed, drove around the *front* of the "C" deuce, and continued on. The Court does not find this evidence to be helpful in determining whether the deuce was sufficiently visible at the time of the collision.

9. Officer Wakefield, who was the first officer to arrive at the scene approximately ten minutes after the accident, checked both of the Daveys for a pulse and found none.

10. Officer Heemer arrived on the scene at approximately 10:51 p.m.—perhaps one-half to three-quarters of an hour after the collision. He smelled an odor of alcohol coming from the Davey vehicle which was "evident without any question." He observed a beer can between Clarence Davey's feet.

11. Dr. Wetherell testified that Norma Davey's blood alcohol level was so high that she was "not very far from being dead from too much alcohol. Maybe another tenth of a percent above, and she's in deep trouble."

time, hearing, information processing, and cognition are all affected by alcohol. Alcohol increases perception and reaction time. At a level of .25 percent, it is likely that an individual would be experiencing double vision regardless of whether he or she is an experienced drinker.

Due to biological variations between individuals, some persons do not experience difficulties with vision, standing, or performing complex physical activities at levels of .25; however, ninety-nine percent of persons are so affected at such a level. "Tolerance" (whether one is an experienced drinker) is distinguishable from the concept of biological variation.

25. The Court rejects the theory propounded by the plaintiff that Clarence Davey, who was an experienced drinker, exhibited a biological variation and was able to perform at a blood alcohol level of .27 percent because he drove approximately ten miles to the scene of the accident without incident. The Court has viewed the videotaped Plaintiff's Exhibit 11 (which, incidentally, was filmed during daylight hours), and it does not appear that the route allegedly followed by Mr. Davey was a particularly treacherous or difficult one to maneuver.

26. Based upon Dr. Wetherell's testimony and upon the other evidence of the amount of alcohol consumed by Clarence Davey on the date of the accident, the Court concludes that Mr. Davey was indeed very intoxicated at the time of the accident, and from this fact, the Court can, and does, infer that his ability to drive his car was impaired. Plaintiff's Exhibit 11 does not significantly detract from this inference; it merely suggests to the Court that Clarence Davey was able in spite of his intoxication to drive his car from Camp Arrowhead to the intersection of Military and Beaver Creek Roads without striking any objects or, most fortunately, other persons or vehicles—until he encountered the deuce. The Court finds that Clarence Davey was driving while in a highly intoxicated and impaired condition, and was negligent in doing so.

27. Although the Court finds the guardsmen's actions to have been negligent, the Court cannot find that these actions created an unreasonably dangerous condition nor that they were a proximate cause of the accident and the deaths of Clarence and Norma Davey. The absence of evidence of braking, skid marks or other indications that Clarence Davey attempted to avoid the collision demonstrate that he did not perceive the indications present at the scene which would have and should have alerted him to slow or to stop, or, in the alternative, that he perceived such indications but was unable to process this information in a timely manner due to his intoxicated state. Mr. Davey should have been vigilant of objects which might appear in his lane. Although the deuce was camouflaged, photographs show it was a rather large vehicle; testimony showed it to be ten to twelve feet tall, and capable of being seen from a few hundred feet away. The illumination present at the scene was sufficient to alert a driver a substantial distance away that *something* was present in the road, even if that object could not be immediately identified as a military truck. Furthermore, the truck with jeep in tow were maneuvering back and forth across the road. Their movement was silhouetted against a background illuminated by the headlights and flashers of the "A" deuce, as well as by the flashing beacon atop the wrecker.

28. The Court finds that Mr. Davey bears the sole responsibility for the accident which took his life, as well as that of his wife and passenger, Norma Davey. Although, as stated earlier, the guardsmen were obstructing Military Road, the Court finds that the collision could have been avoided but for the intoxication of Clarence Davey. The obstruction was visible from such a distance that he should have, and could have but for his intoxicated condition, perceived and reacted to the presence of the deuce in time to stop before impact.

29. The Court finds that Norma Davey was negligent with respect to the accident which caused her death. Mrs. Davey's own drinking impaired her condition to a point at which she was unable to drive herself

and her husband home. She voluntarily rode as a passenger with her husband, who was driving while intoxicated. She would not have been killed but for her own intoxication.

30. The plaintiff's expert, Dr. Ellis King, performed an evaluation of the accident scene which included a field visibility study conducted in a large, open field located at the University of North Carolina campus.[12]

Using a 46" by 48" target composed of two different military camouflage materials placed upon an easel in the field, he conducted illumination tests using the high and low beam headlights of a 1971 Volkswagen beetle automobile. He measured the light striking the target and the light reflected from the target back to the Volkswagen, and using these illumination figures, calculated the "contrast" between the target and the background.[13] He compared his results to minimum contrast values which are needed in order to perceive an object.[14] Dr. King made three different sets of measurements: at 200 feet from the target, at 150 feet from the target, and at 100 feet from the target. His conclusion, based upon these measurements, was that a "normal sober driver" driving the Volkswagen would not have perceived the deuce until it was less than 150 feet away. Finally, he concluded that the perception reaction time which would have been required in order for an average, sober driver of the Volkswagen to be able to avoid the accident was 2.5 seconds, which would have required a driver traveling at 55 miles per hour to perceive the vehicle at a distance of 200 feet away.[15] His opinion was that alcohol was not a factor in the accident because a sober driver would not have perceived the deuce in time to avoid hitting it.

The Court finds that it can place little weight on Dr. King's testimony regarding the results of his experiments. The Court is not convinced that there was substantial similarity between these experiments and the conditions present at the intersection of Military and Beaver Creek Roads on the evening of August 6, 1989.

The weight of the evidence on the record convinces the Court of this lack of similarity. First, Dr. King's use of only a four-foot square of camouflage material in his experiment is questionable. The evidence shows that the deuce was a very large vehicle, approximately ten to twelve feet in height, with a trailer portion in back which could transport large numbers of persons. A second and more troubling aspect of Dr. King's studies concerns his use, or nonuse, of lighting in the experiments. In his tests, Dr. King *assumed no lighting at the intersection other than the Volkswagen headlights.* The facts show that additional illumination was present at the intersection on the night of the accident. However, Dr. King excluded from his measurements the light which would have been created by the "A" deuce headlights and emergency flashers, by the head and taillights of the "C" deuce in the road, by the reflectors on the jeep, and by the taillights and yellow flashing beacon on the wrecker.[16] Thus, his

12. Dr. King first visited the accident site on the day before his testimony at trial. He did so in order to verify the similarities between the site and the field in which he conducted his study. Coincidentally, he found the two locales to be "very similar."

13. Dr. King defined "contrast" as the difference between the blackness of an object and its background. He testified that the absence of contrast would mean that an object could not be seen.

14. Dr. King testified that he used published tables indicating minimum contrast values.

15. In reaching this conclusion, Dr. King relied upon values established by the American Association of State Highway and Transportation Officials to calculate the distance which would be traveled between the point at which an object is perceived and the point at which brakes are applied.

After conducting the field study, Dr. King conducted a second study under "controlled laboratory conditions" in order to confirm the results of the field study. These controlled laboratory conditions consisted of measurements of panels of camouflage materials on a black background in a dark tunnel. He concluded that this second experiment verified the results of the field study.

16. Dr. King did not assume the presence of the yellow flashing globe because two officers who arrived on the scene from the same direction as the Daveys indicated that they could not see it.

tests assumed that there was *nothing else* present at the intersection which could be seen. This assumption is simply a palpable disregard of the evidence. Dr. King ignored the presence of the "A" deuce emergency flashers completely. These flashers provided a source of warning. Dr. King also dismissed the presence of the headlights of that vehicle and the presence of the jeep reflectors because he felt that these would provide a source of "confusion" to drivers. Dr. King's rejection of these warning factors present at the scene is bewildering and renders his conclusion— that an obstruction could not be perceived until less than 150 feet away—utterly incredible. Furthermore, the "C" deuce and jeep, with radically different silhouettes, were maneuvering across the highway against a background of illumination created by the headlights and flashers of the "A" deuce parked on the side of Military Road. Dr. King used a stationary target in his tests; yet, the "C" deuce and jeep were moving targets. This movement at the illuminated scene would have further alerted a reasonable driver to use caution.

31. The defendant's expert, Joseph Jager, conducted an accident reconstruction at the scene on the evening of October 18, 1983.[17] Utilizing the actual Guard vehicles present at the time of the accident, three Guardsmen who were also present at that time, and a 1972 or 1973 Volkswagen beetle, he recreated the events of the accident.

Present at the reconstruction, in addition to Mr. Jager, were Guardsmen Caswell, Douglas, and an unidentified Guardsman, most likely Grimms.[18] Prior to the actual reconstruction, during daylight hours, the vehicles were put into position at the scene. Caswell placed the "C" deuce in the location which he believed it to be in at the time of the collision; he placed it as closely as possible to the position at which he remembered it being at the time of the impact.[19] A second guardsman, probably Grimms, placed the wrecker into position on the southbound shoulder of Military Road. Finally, Douglas, who was a passenger in the "A" deuce on the night of the accident, participated in placing that vehicle, as best he could recall, in the location in which it was parked on the northbound shoulder of Military Road during the events. He placed this vehicle after the other two had

Dr. King did not explain whether the beacon, even if not itself visible to southbound traffic, could have provided contrast between the "C" deuce and its background, inasmuch as the wrecker was parked on the opposite side of the deuce.

17. Mr. Jager's written report regarding his test results (Defendants' exhibit O), which was prepared in November, 1983, was offered into evidence by the defendants and was not at that time objected to by the plaintiff. Later during the trial of this matter, the plaintiff offered into evidence two reports which were prepared by Dr. King on September 15, 1989 (plaintiff's exhibits 18 and 19)—*after the trial had already begun.* The defendants immediately objected to these reports on the basis that they had not been provided to the defense until the day of Dr. King's testimony. Upon the defendants' objection to Dr. King's reports, the plaintiff also decided to interpose a belated objection to the admission of Mr. Jager's report as well, claiming that this latter document had not been provided to plaintiff's counsel until shortly before the trial. Inasmuch as none of these three documents is specifically listed in the pretrial order, and the parties have subsequently indicated in their post-trial filings with the Court that they will withdraw their respective objections if the

Court finds the reports to be admissible, *and the* Court does find each of the reports to be admissible evidence, each of the reports has been admitted and considered.

18. Caswell testified that himself, Johnson, and a third guardsman whose name he did not know were present at the reconstruction. Johnson testified in his deposition that he was not present at the reconstruction. Douglas testified that he was present, and participated in the placing of the "A" deuce. Ouding testified that he did not attend the reconstruction. Grimms, who was behind the wheel of the wrecker at the time of the accident but did not testify at trial, *was most likely the guardsman who participated* in the placing of the wrecker. Inasmuch as Caswell did not know Johnson well at the time of the accident, and the two did not discuss the events afterwards, it is likely that *Caswell was* mistaken about the names of those present at the reconstruction.

19. Mr. Jager used police measurements (which were included in the police report) taken of the location of the "C" deuce in confirming the positioning of the vehicle. In addition, he identified police markings on the southbound lane of Military Road as an outline of the fuel tank of the vehicle.

already been placed. According to Douglas, the illumination of the scene present during the reconstruction—which took place at night—appeared the same as it had on the night of the accident, with the exception that he did not turn on the emergency flashers of the "A" deuce during the reconstruction. These flashers were on at the time of the collision. The lights of the towed jeep were not turned on during the reconstruction, but two reflectors on the passenger side of the jeep were visible.

During the reconstruction, Caswell drove the deuce forward and back, while towing the jeep, across the Beaver Creek Road and Military Road intersection as he had the night of the accident. This was done three times to determine the acceleration of the vehicle. Mr. Jager measured the location of the vehicle at two-second intervals. In addition, he measured a distance north of the vehicle at two-second intervals, using a Volkswagen beetle (Mr. Jager did not himself drive the Volkswagen.) Distances were measured at two, four, six, and eight-second intervals.[20] At the eight-second interval, the Volkswagen would have been 646 feet away from the deuce. At the six-second interval, the car would have been 485 feet away. At the four-second interval, the car would have been 323 feet away. Finally, at the two-second interval, the car would have been 161 feet away from striking the deuce. Using markings which he placed at these measurement points, Mr. Jager took photos with a 35 millimeter camera at each of the four two-second intervals. The Court finds these photos to be an accurate representation of the reconstructed accident scene.[21]

Mr. Jager calculated the total stopping distance which would have been required in order for a vehicle traveling at 55 miles per hour to avoid the collision was 276 feet. In other words, the driver could have perceived, reacted and come to a complete stop before impact, if he had perceived the deuce in the road at a distance of 276 feet or more away. This would place the driver at a point on Military Road between the two and four-second intervals measured by Mr. Jager. However, based upon the photos and upon the testimony presented by Mr. Jager, the Court finds that an obstruction in the road is visible from as far away as the eight-second interval, or 646 feet away.[22] The reflector on the jeep is clearly visible, as is the yellow beacon light. Furthermore, one can discern, to the right of the intersection, what appears to be the outline of the deuce wheels. At the two-second interval—161 feet away—the headlights of the "A" deuce provide a clear picture of the jeep, and the rear of the "C" deuce is clearly visible as well, even in the absence of the visibility of the beacon. However, because the presence of an obstruction can be detected much earlier—as far away as eight seconds—a reasonable, prudent driver would have begun to slow his or her vehicle well before the two-second mark, where the jeep and truck can be clearly identified as such.

The Court finds the reconstruction conducted by Mr. Jager to depict conditions substantially similar, albeit not identical, to those present at the time of the accident, based upon the testimony of the witnesses present during the accident and those present during the reconstruction as well, including Mr. Jager. The Court finds Mr. Jager's testimony and conclusions to be credible. His testimony, and the photos depicting the reconstruction, support a finding that Clarence Davey's negligence was the sole and proximate cause of the accident.

**20.** In measuring the distance of the Volkswagen at two-second intervals, Mr. Jager assumed that Mr. Davey never applied his brakes, which is consistent with the evidence.

**21.** Mr. Jager testified that the clarity of the objects represented by eight, six, and four-second photos was better to the naked eye than it appears in the photos.

**22.** From the photo taken by Mr. Jager at the six-second interval, less appears visible to a driver at this shorter distance away than from the photo taken at the eight-second interval. Mr. Jager testified that the lighting in the six-second photo appears less bright than it was in actuality, most likely because the rotating beacon atop the wrecker was turned away from the direction of the camera at the time this shot was taken.

## CONCLUSIONS OF LAW

In accordance with Fed.R.Civ.P. 52(a), the Court reaches the following conclusions of law [23]:

A. This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1346(b). All administrative remedies have been exhausted as required by the Federal Tort Claims Act, 28 U.S.C. section 2675(a).

B. Venue is proper in this district.

C. Under the Federal Tort Claims Act, 28 U.S.C. section 2674, and under 28 U.S.C. section 1346(b), the United States is liable for damages for personal injury caused by the negligent or wrongful act of any employee of the Government while acting within the scope of his employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act occurred. Under 28 U.S.C. section 2671, an "employee of the government" includes members of the National Guard while engaged in training or duty under section 316, 502, 503, 504, or 505 of title 32. The guardsmen involved in this case were en route to summer maneuvers and thus fall within 28 U.S.C. section 2671.

D. M.C.L.A. section 691.1405 provides that governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any employee of the agency of a motor vehicle of which the agency is the owner. The State of Michigan has in its Answer, admitted ownership of the National Guard vehicles in question, and therefore is not subject to sovereign immunity in this case.

■ E. Under Michigan law, an employer is liable for the acts of its employee committed within the scope of his or her employment. *McCalla v. Ellis*, 129 Mich. App. 452, 341 N.W.2d 525, 528–29 (1983). The National Guardsmen were acting within the scope of their employment with the National Guard at the time of the accident on August 6, 1983.

■ F. Michigan law places a duty upon motorists who stop upon the highway to use care to avoid obstructing oncoming traffic. The guardsmen had a duty to use care in executing a three-point turn in a camouflaged vehicle on the highway. Notably, Michigan traffic laws prohibit stopping a vehicle, either attended or unattended, on the paved portion of a highway, when it is possible to stop the vehicle off the highway. M.C.L.A. section 257.674. Even if Caswell did not at some point actually "stop" the deuce in the highway, he most certainly violated M.C.L.A. section 257.634, which requires the driver of a vehicle to drive on the right half of the roadway. The facts show that during backing, Caswell at some point was blocking both lanes of Military Road and was therefore not driving solely on the right half of the roadway. Violation of a statute is evidence of negligence and establishes a prima facie case from which the Court may draw an inference of negligence. *Zeni v. Anderson*, 397 Mich. 117, 243 N.W.2d 270, 283 (1976). This presumption has not been rebutted. Given the camouflaged nature of the vehicle and the nighttime conditions, greater care should have been taken. The Court finds the actions of the guardsmen to be negligent. However, in order to hold the defendants liable, the plaintiff must still establish that the violation of the statute was a proximate cause of the decedents' deaths. *Longstreth v. Gensel*, 423 Mich. 675, 377 N.W.2d 804, 814 (1985). In this case, the negligence of the guardsmen was not a proximate cause of the accident.

G. The plaintiff has objected to the admission of evidence of the Davey's blood alcohol tests, arguing that 1) results of blood tests administered pursuant to Michigan's implied consent statute (M.C.L.A. section 257.625a) are admissible only in civil proceedings; and 2) the procedure set forth in M.C.L.A. section 257.625a(10), pertaining to obtaining samples of a decedent's blood for the purpose of determining blood alcohol content, was not complied with.

■ Blood tests performed on living persons pursuant to the Michigan's implied consent statute generally cannot be used in

---

**23.** Any conclusion of law containing findings of fact shall be considered as such.

civil litigation. *Bufford v. Brent,* 115 Mich.App. 146, 320 N.W.2d 323, 325 (1982). This prohibition, however, does not extend to use of blood alcohol tests performed on deceased persons. *Green v. St. Clair County Road Comm'n,* 175 Mich.App. 478, 438 N.W.2d 630, 631 (1989).

■ Even assuming that the requirements of M.C.L.A. section 257.625a(10) pertain to the admissibility of the test results, the procedures set forth in this statute have been followed. The statute provides that after a motor vehicle accident in which the driver of a car has been killed, "a sample of the decedent's blood shall be withdrawn in a manner directed by the medical examiner for the purpose of determining blood alcohol content...." Dr. Gosling withdrew the blood samples. He was a deputy medical examiner for Crawford County at the time of the accident, and was authorized to draw blood samples for the purpose of determining blood alcohol content. Under these circumstances, the Court concludes that the statutory procedure set forth in M.C.L.A. section 257.625a(10) was followed.

■ The plaintiff has also questioned the handling of the blood samples themselves. Whether the proponent of evidence has proved an adequate chain of custody goes to the weight rather than the admissibility of evidence. *Hoover v. Thompson,* 787 F.2d 449, 450–451 (8th Cir.1986); *Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1154 (5th Cir.1981). The issue of PEP alteration, contamination, or adulteration of the evidence is a question for the factfinder once the proponent of the evidence makes a threshold showing that reasonable precautions were taken against the risk of alteration, contamination, or adulteration. *Id.* at 1155. Once this threshold showing has been made, "any doubts raised concerning the possibility of alteration or contamination of the evidence go to the weight and not the admissibility of the evidence." *Id.* In this case, the evidence showed that Dr. Gosling, a licensed physician, arrived at the scene of the accident approximately 20 min-

utes thereafter, and assisted in the removal of the Daveys' bodies from their automobile. He also knew the Daveys prior to the accident. He was therefore able to identify the Daveys as the decedents from whom the blood was taken approximately four hours later in the morgue. This was within a reasonable period of time after the accident. Dr. Gosling personally withdrew the Daveys' blood samples. He followed his usual practice, which was, using a sterile needle, to withdraw the blood, introduce it into tubes which come with a kit which was provided by the state of Michigan for blood alcohol content analysis, label the tubes using forms which were provided with the kit, and seal the specimen tubes within the kit, with the assistance of a police officer. Dr. Wetherell, a toxicologist employed by the State Police, received the two sealed, labeled kits by first-class mail from the Crawford County Sheriff's Department, and personally picked them up in the mail room of the Department of State Police on August 9, 1983. Upon receipt, he identified the two vials of blood by assigning a number to that of Clarence Davey and to that of Norma Davey. Prior to testing, he stored the blood in a refrigerator. He tested the two specimens for the presence of ethyl alcohol—the type of alcohol present in alcoholic beverages. Finally, he tested the specimens to determine the percentage of alcohol in the blood.

Although the Daveys' bodies may have remained alone in the morgue for a period of time before Dr. Gosling withdrew the blood samples, the Court is convinced that the likelihood of tampering is remote. The Court is further convinced that there was no break in the chain of custody of the samples. Notably, the samples were sealed by Dr. Gosling, and arrived *sealed* at the Department of State Police; there was no evidence of tampering. Furthermore, a possible break in the chain of custody affects only the credibility, but not the admissibility, of the blood tests. *Hoover,* 787 F.2d at 450–451. Because there is additional testimony which lends credibility to the high levels of blood alcohol evidenced

by the test results,[24] the Court finds the blood alcohol test results to be admissible and credible.[25]

H. M.C.L.A. section 257.625b provides that a person shall not operate a vehicle upon a highway while in an impaired condition due to the consumption of alcohol. M.C.L.A. section 257.625a(3)(c) further provides that if blood alcohol tests determine that an individual was driving with a blood alcohol level of 10 percent or more, it is presumed that the individual was intoxicated.

 The statutory presumption of intoxication contained in M.C.L.A. section 257.625a(3)(c) does not apply in civil actions. *Scott v. Angie's Inc.*, 153 Mich.App. 652, 396 N.W.2d 429, 435 (1986). Nonetheless, even absent the application of the statutory presumption of intoxication, the great weight of the evidence supports a finding that Clarence Davey was driving while intoxicated at the time of the accident. The Court further finds that Clarence Davey could and should have perceived the obstruction and avoided it, but for his intoxication. His intoxication prevented him from perceiving the "C" deuce and from stopping his car within a sufficient distance to avoid striking it. Thus, Clarence Davey's comparative negligence was the sole and proximate cause of the accident.

**24.** A number of witnesses testified that a strong odor of intoxicants was coming from the Daveys' car after the accident. At least one beer can was present in the car. Furthermore, Bonnie Davey testified that her parents drank two beers each at a bar at approximately noon on the day of the accident. Rick Gaertner testified that Clarence split a twelve-pack of beer with him at the Davey home between approximately 1:00 p.m. and 8:00 p.m., and that Norma Davey as well drank beer before she and her husband left for the party on the evening of the accident. Finally, Richard Jones testified that between noon and 1:00 p.m., Clarence drank at least one beer out of a keg which he kept in a refrigerator in the Davey garage; that both Clarence and Norma drank beer at the Camp Arrowhead party; that Clarence consumed approximately four eight-ounce beers at the party within a period of one and a quarter hours; and that Norma looked as though she had had too much to drink at the party and was staggering to the car.

**25.** The plaintiff has argued that the blood test results are also inadmissible because the defendants cannot establish compliance with a nine-part evidentiary test set forth in *Gard v. Michigan Produce Haulers*, 20 Mich.App. 402, 174 N.W.2d 73 (1969), for determining the admissibility of blood alcohol tests. In *Gard*, the Michigan Supreme Court stated that a party seeking introduction of such tests must show as follows:

'* * * (1) that the blood was timely taken (2) from a particular identified body (3) by an authorized licensed physician, medical technologist, or registered nurse designated by a licensed physician, (4) that the instruments used were sterile, (5) that the blood taken was properly preserved or kept, (6) and labeled, and (7) if transported or sent, the method and procedures used therein, (8) the method and procedures used in conducting the test, and (9) that the identity of the person or persons whose supervision the tests were conducted be established. * * *'

174 N.W.2d at 76 [sic] (quoting *Lessenhop v. Norton*, 261 Iowa 44, 153 N.W.2d 107, 112 (1967)). The Court notes that the *Gard* test is a judicially-fashioned evidentiary test. Although Michigan courts are bound to follow the case's prescription, questions concerning the admissibility of evidence in this Court are controlled by the Federal Rules of Evidence. *See McKinney v. Galvin*, 701 F.2d 584 (6th Cir.1983) (evidence of refusal to submit to breathalyzer test properly admitted; Michigan statute did not prohibit such use, and admissibility of evidence in section 1983 action was controlled by the Fed.R. Evid.); *see also Romine v. Parman*, 831 F.2d 944 (10th Cir.1987) (Fed.R.Evid. applied in diversity action in determining whether probative value of evidence of drinking was substantially outweighed by danger of prejudice); *McInnis v. A.M.F., Inc.*, 765 F.2d 240 (1st Cir.1985) (Fed.R. Evid., rather than state judicially fashioned evidentiary rule, applied in determining admissibility of evidence of drinking). Although this Court is required to follow state substantive law, *Douglas v. United States*, 658 F.2d 445, 449 (6th Cir.1981), this Court must also follow the Federal Rules of Evidence.

Under the Federal Rules of Evidence, all relevant evidence is admissible unless otherwise provided by the Constitution, an act of Congress, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed.R. Evid. 402; *McKinney*, 701 F.2d at 589. In this case, evidence of Clarence Davey's drinking, including his blood alcohol level, is highly relevant to the issue of his comparative negligence, and its probative value is not substantially outweighed by the danger of unfair prejudice. *Romine*, 831 F.2d at 945; *McInnis*, 765 F.2d at 246; *Ballou*, 656 F.2d at 1155. Likewise, evidence of Norma Davey's drinking is highly relevant to the issue of her own personal comparative negligence; her own drinking could have affected her ability to judge whether she should allow her husband to drive the couple home after the party on the night of their deaths.

I. The Court finds that Norma Davey knew that her husband had been drinking since approximately noon on the day of the accident. She had been drinking since that time herself, although perhaps noncontinuously. She went to the party accompanied by her husband in their car, knowing full well that one of them would have to drive home. She drank a substantial amount at the party, as did her husband. There is no evidence that she attempted to stop her husband from drinking. She herself became intoxicated to the point that she could not walk unassisted to the car, and permitted her husband to escort her into the passenger side of the car. She allowed him to drive with beer in the car.[26]

It matters not whether Clarence Davey was visibly intoxicated;[27] Norma knew he had been drinking heavily, yet she did not stop drinking herself, even though she knew that their home was a number of miles away, and that one of them would have to drive. The Court finds that Norma Davey's own comparative negligence, as well as the comparative negligence of her husband, proximately caused her death.

J. The plaintiff has requested damages in excess of the amounts of the administrative claims made against the United States on behalf of the Davey estates.[28] However, because the Court finds that the Daveys' own negligence was the sole and proximate cause of their deaths and awards no damages, the Court finds it unnecessary to resolve the question of whether the plaintiff is entitled to amounts in excess of the administrative claims.

## CONCLUSION

Based upon the foregoing, IT IS THEREFORE ORDERED that a judgment of no cause of action be entered in this matter.

IT IS SO ORDERED.

26. In *Heyler v. Dixon,* 160 Mich.App. 130, 408 N.W.2d 121, 130–31 (1987), the court found the following facts to be supportive of a finding of comparative negligence: 1) the plaintiff decedent had driven the defendant-driver to a lounge at noon on the day of her death; 2) the plaintiff decedent returned to meet the defendant at the lounge nine hours later; 3) the plaintiff decedent observed the defendant drink one or two beers per hour; 4) the plaintiff decedent did not drink, but did not attempt to stop the defendant from drinking; 5) the plaintiff decedent lived two blocks from the lounge, but instead elected not to walk home; 6) the plaintiff decedent observed the defendant leaving the lounge with a bottle of beer; and 6) the plaintiff decedent allowed the defendant to drive, even though other persons in the bar believed the defendant was then visibly intoxicated. Similarly, the facts in this case support a finding of Norma Davey's comparative negligence.

27. Dr. Wetherell's testimony supports the conclusion that given Clarence Davey's blood alcohol level, he must have been visibly intoxicated. However, the Court believes a finding of Norma Davey's comparative negligence is justified even in the absence of Clarence Davey's *visible* intoxication. Norma Davey was with her husband at the party, and must have observed the amount

of alcohol he consumed. In addition, she spent the majority of the day of her death with her husband, and must have observed him drinking prior to the party. In spite of her observations, Norma herself chose to drink to the point where she was in no condition to drive the couple home. In *Vanderah v. Olah,* 387 Mich. 643, 199 N.W.2d 449 (1972), a conclusion of contributory negligence was justified by a finding that the passenger/wife got into her husband's car and rode with him knowing that he was intoxicated, where the evidence showed that the couple left a bar located four miles west of the accident scene, after having had two beers each, and the husband drove recklessly. The facts in the instant case are far more supportive of a finding that Norma Davey must have had knowledge of her husband's intoxication, and of a finding of her comparative negligence.

28. 28 U.S.C. section 2675(b) provides as follows: Action under this section shall not be instituted for any sum in excess of the amount presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.